[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties were married in St. Louis, Missouri on October 25, 1969, and have been residents of the State of Connecticut for more than twelve months next preceding the date of the filing of this complaint. There are two adult daughters issue of this 28 year marriage, Elizabeth, age 23 and Nancy, age 18.
The plaintiff wife, age 53, is a high school graduate with one year of college courses. This is her first marriage and she enjoys apparent good health with no stated medical problems. She related that after the marriage the couple also lived in Houston, Texas and then moved to Connecticut in 1973. The husband was employed by the Olin Corporation as a product manager and the wife had several various jobs both before and after the birth of their oldest daughter Elizabeth in November of 1973. Several of the wife's jobs were for and related to the Town of Trumbull where she worked in the town counsel's office and as a clerk to several town committees. The wife also participated in town affairs as P.T.A. president, was on the board of the Rehabilitation Center and was a member of the Junior Women's Club. She also worked for the Trumbull Fire District tax collector and handled park stickers at the Trumbull Town Hall. In 1986 the husband lost his job at Olin and the wife then sought more regular employment at a dental office and with Office Temporaries. She is currently employed full time as a secretary with the Trumbull school system.
Both daughters were involved in swimming activities and the wife attended all swim meets and most practices with them. When the youngest daughter, Nancy, was diagnosed with Hodgkins Disease the wife testified it was she who took her to the oncologist at Yale New Haven Hospital for approximately sixty visits. The husband lost his job at Olin in 1986 and later went into an independent business which was not successful. The wife felt that CT Page 2926 the job loss at Olin was because "he was not a team player, had bad reactions and had difficulty getting along with others." At or about this time the husband was also diagnosed as a diabetic and the wife further related that he was not communicative, would not test his blood regularly and that she had to call EMS on occasion and take him to the hospital emergency room. She stated that he had about six bad reactions a year.
In 1987 the wife moved out the master bedroom, slept in a separate bedroom and suggested they attend marital counseling. They in fact did attend counseling for five or six months but the husband was still uncommunicative and they stopped counseling. The wife maintained her separate bedroom until she left the marital home in September of 1996 after her youngest daughter graduated from Trumbull High School.
The wife related that she went to a doctor for "severe anxiety, saw a therapist and also met with her parish priest in an effort to save the marriage. The wife stated that prior to this time she had been a social drinker but her husband's actions and her daughter's illness caused her to now drink more heavily. She further relates that prior to 1991, it was she who paid all of the family and household bills but at this time the husband announced he would be paying the bills thereafter. She had no idea of their finances from this point on. However, she relates that he failed and neglected to pay some very important bills and cited the filing of a tax lien against their home by Internal Revenue Service for the husband's failure to pay $9,201.56 due on his individual federal income tax return, a State of Connecticut Department of Revenue Services lien against the parties for failure to pay $1,653.56 for the tax return year of 1992, a notice of cancellation of their automobile and home owners insurance policies because of his failure to pay premiums and a notice of foreclosure on their home from the bank for his failure to make bank mortgage payments when due. She claims to have given the husband $5,000.00 at this time as he had no savings left.
The wife felt that she had done everything possible to avoid a dissolution of the marriage and this trial even to the point of making no claim against the husband for alimony. However, she alleges that the husband insisted on a trial so that his story could be told. The wife testified that she felt a 50-50 split on the couples assets was equitable but that the husband opposed any equitable settlement. She stated that she was forced to open her CT Page 2927 own bank account in 1992 after her husband admitted to her that he had gone through all of the money.
The plaintiff's financial affidavit reflects a gross weekly income of $604 with a total net weekly income of $455. She lists $623 in weekly expenses and shows $3,160 in liabilities. She lists as assets a one-half equity in the marital residence located at 19 Great Brook Road, Trumbull, Connecticut, valued at $115,000, a one half interest in a 1991 Ford Taurus automobile valued at $7,780, a one-half interest in a 1986 Buick Century automobile she values at $960 and a one-half interest in a 1985 Honda Prelude which she values at $2,770. She also lists a bank savings account of $150 and a second savings account of $2,700; a Dreyfus IRA valued at $24,000, a Travelers annuity of $3,741 and a Town of Trumbull pension presently valued at $22,000 for a total cash value of assets in the amount of $173,346.
On cross examination by her husband the wife readily admitted to an excessive use of alcohol for a limited period of time. She attributed her heavy drinking to "a troubled marriage and the illness of her youngest daughter." She admitted to calling her husband some terrible names and probably spit on him on occasion, that she had a bad temper, broke a lamp, threw a coffee mug, and slammed and broke a kitchen cabinet door. She also admitted to having had an extra marital affair during the marriage but "long after the marriage had broken down irretrievably." The wife also admitted to "receiving approximately $14,000 from her mother about ten years ago." She denied her husband's claim that she attempted to stab him with a large kitchen knife and claimed it was the husband who pulled a knife on their youngest daughter at one time.
John Preston Merritt, a 1979 University of Connecticut graduate with a B.S. in Accounting and a CPA since 1980 with eight years of experience at Leventhal and Horwath, testified for the plaintiff-wife. He stated that he had valued approximately 120 to 160 pensions and at the wife's request obtained information from Olin company that enabled him to value the husband's pension as of October 31, 1997 at $118,024. Mr. Merritt also valued the wife's pension plan with the Town of Trumbull at $22,753 as of January 23, 1998.
Mr. James Hliva of Trumbull was subpoenaed by the pro-se husband, defendant. Mr. Hliva is an employee of the Town of Trumbull and also "does simple straight 1040 tax returns for a CT Page 2928 fee." He has known Mrs. Downer for several years and stated that sometime between Christmas and New Years of 1997 he called the wife's brother, Harry B. White, III, in St. Louis, who told him that Mrs. Downer's mother had been ill and that she had transferred every thing to him shortly before her demise. He testified further that Mrs. Downer had nothing in St. Louis and that he had helped her move her belongings from the marital residence to Shelton. He stated that he had been to her Trumbull home several times over the years mostly to perform various repairs. He admitted to being there on more occasions during the year or so before Mrs. Downer had moved out. The witness admitted to having occasional intimate relations with the plaintiff wife and that they had taken several overnight trips together but stated that all of this occurred after 1994.
The defendant husband, also age 53, is a college graduate of Illinois Institute of Technology and has an MBA degree from the University of Connecticut. He was employed by the Olin Corporation for twenty years until 1986. He had worked in the purchasing, customer service and distribution departments at Olin and was earning approximately $8100-$8400 per month or about $100,000 per year at the time of his termination at the age of 41. He states that he was never told the reason for his termination and that thereafter he could never obtain comparable employment. He stated that when his medical benefits ran out in 1987, his wife went to work in order to secure medical benefits for the family. He cited the wife's "adulterous affair" as the cause of the marriage breakdown but could not put a date on same. He related that he was diagnosed as a diabetic in 1975 and is presently an insulin dependent diabetic. He has been to three doctors for this condition which is manifested by occasional slurred speech, impaired vision, headaches, irrational acts and a loss of consciousness. He claims to regularly check his blood sugar level, has quit smoking and three years ago stopped drinking completely on the advice of doctors. He claims to have six to eight hypoglycemic episodes a year and visits the doctor annually and also as necessary.
The husband recounted that he returned to the marital home late in the afternoon of September 23, 1996 and noted that some furniture and other items were missing including all of his wife's clothing. He alleges that he had relations with his wife up to 1992 and perhaps beyond that date. He further testified that the wife's mother had recently deceased in St. Louis and claims that she gave the wife money prior to her death and that CT Page 2929 his wife will now inherit additional wealth. He was particularly upset that the wife took all of the family pictures with her including those of the children.
On cross examination by the wife's attorney the husband was asked about his Olin pension plan which has a present value of approximately $118,000 and a Canada life insurance policy with a present cash surrender value of $40,206 and why the husband failed and neglected to list these two items on any financial affidavit he filed during the pendency of this dissolution. The husband stated that he transferred ownership of the Canada life policy to his two daughters on March 18, 1997 and that the Olin pension plan did not have to be listed because it had no present value and had not yet vested. When questioned about causes for the marriage breakdown he blamed the wife's adultery, her temper and the fact that she got mad at him very easily. He did not feel that the wife's receiving a notice of foreclosure from the bank for his failure to make mortgage payments, a letter from the insurance company that their automobile insurance coverage had been canceled for non-payment of premiums, the filing of an internal revenue service tax lien against their home for husband's failure to pay adequate taxes on his individual federal income tax return, a tax lien by the State of Connecticut for his failure to pay state taxes, his bizarre conduct of running through the house in his underwear when their daughter was having a sleep over with friends, or his urinating on the floor could be causes for the marriage breakdown. He claimed to have no recollection of these events which "were probably caused by a hypoglycemic reaction from his diabetic condition." He further admitted that when the wife moved from the marital residence she left a substantial amount of furniture and that daughter Beth could have given her mother permission to take her furniture from the marital home.
The husband's financial affidavit reflects two jobs with a gross weekly salary of $503 as a laborer for Ansonia Copper and Brass, Inc. plus a gross weekly salary of $174 from Dial America Marketing for a net weekly income of $537 from both jobs. He lists $564 in weekly expenses which includes $274 for a mortgage payment on the marital residence. He shows $4,816 as an IRS tax liability and $1,037 as a Connecticut tax liability. He reflects total assets of $116,208 of which a $110,000 represents his one-half interest in the marital residence which he values at $280,000, a one-half interest in a 1985 Honda at $250, and $300 in a Fleet bank checking account, $2,204 in an Aetna 401K and CT Page 2930 $3,454 in a Dreyfus IRA. He has not valued or included the $118,000 Olin pension plan as previously discussed.
The court has fully considered the credibility of all of the witnesses who took the stand and testified in this matter. It has observed their appearance, attitude, demeanor and testimony upon direct and upon cross examination, and has considered the interest, if any, they have in the outcome of this case. It has also considered the many exhibits presented by the parties.
The evidence presented established that the marriage has irretrievably broken down and that both parties shared in the fault.
With respect to alimony and a division of the property of the parties, the law and elements thereof to be considered are stated in §§ 46b-81 and 46b-82 of the Connecticut General Statutes and are interpreted as follows:
To begin with, our alimony statute does not recognize an absolute right to alimony. General Statutes § 46b-82. Thomasv. Thomas, 159 Conn. 477, 486 (1970). `This court has reiterated time and again that awards of financial settlements ancillary to a marital dissolution, rest in the sound discretion of the trial court. Posada v. Posada, 179 Conn. 568, 572 (1980).
Although the court is required to consider the statutory criteria of length of marriage, causes for dissolution, the age, health, station in life, occupation, amount and sources of income, assets, and opportunity for future acquisition of assets of each of the parties, Fucci v. Fucci, 179 Conn. 174, 179
(1979), no single criterion is preferred over all the others. In weighing the factors in a given case the court is not required to give equal weight to each of the specified items. Nevertheless, it is rather obvious that in making financial determinations, the financial circumstances, both actual and potential, are entitled to great weight." Valente v. Valente, 180 Conn. 528, 530-531
(1980).
A property division ought to accord value to those non monetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of CT Page 2931 marriage. we hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary caretaking responsibilities." Blake v. Blake,207 Conn. 217 at 230 (1988), where our Supreme Court cited with approval the language of O'Neill v. O'Neill, 13 Conn. App. 300 at 311 (1988).
Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account," Scherr v. Scherr,183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence, other than has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria. (§§ 46b-82 and 46b-81 (c))." Weimanv. Weiman, 188 Conn. 232, 234 (1982).
"The rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other." Ehrenkranz v. Ehrenkranz,2 Conn. App. 416, 424 (1984).
The court has carefully considered all of the criteria and requirements set forth in Connecticut General Statutes §§46b-56, 46b-61, 46b-81, 46b-82 and 46b-84, as well as all other relevant statutes, the cases dealing with the subject and all of the evidence presented in this particular case in reaching the decisions reflected in the following orders.
1. The evidence presented established that the court has jurisdiction, the marriage has irretrievably broken down and Judgment may enter dissolving the marriage.
2. The parties shall cooperate to finalize a sale of the marital residence located at 19 Great Brook Road, Trumbull, Connecticut which shall be sold at the earliest possible date for the highest possible price. After payment of the existing mortgage, brokerage commission and usual closing costs, the net proceeds shall be divided 40% to the wife and 60% to the husband. The husband may continue to occupy said premises prior to the sale and he shall be responsible for the payment of the mortgage, taxes, insurance, utility bills, and all operating expenses for so long as he occupies said premises. The wife may request this court to order the husband's CT Page 2932 immediate removal from said premises if he does not fully cooperate in the sale of same.
3. The husband shall be solely responsible for paying the Federal Tax Lien on said property in the approximate amount of $9,200.00 which arose from his 1040 Individual Tax Return for the tax period ending December 31, 1992.
4. The husband shall execute a Qualified Domestic Relations Order (QDRO) assigning a 50% interest in the present approximate $118,024 value of his Olin Pension to the wife.
5. The husband shall retain his Aetna 401K plan listed at $2204 and his Dreyfus IRA plan listed at $3454.
6. The husband shall retain the 1985 Honda Prelude he currently drives.
7. The husband shall have the 1982 Mercury, presumably for the use of the daughter, Nancy.
8. The husband shall be solely responsible for the liabilities as listed on his Financial Affidavit except for the State of Connecticut Income Tax Lien in the approximate amount of $1600 which shall be paid equally by the parties.
9. The husband shall retain his Fleet Bank checking account.
1O. The wife shall retain the 1991 Ford Taurus she presently drives.
11. The wife shall retain her Dreyfus IRA in the approximate amount of $24,000.
12. The wife shall retain her Travelers Annuity in the approximate amount of $3,741.
13. The wife shall execute a Qualified Domestic Relations Order (QDRO) assigning a 50% interest in the present approximate $22,000 value of her Town of Trumbull pension to the husband.
14. The wife shall retain her present bank accounts at Fleet Bank in the approximate amount of $2,850.
15. The wife shall be solely liable for the liabilities listed on CT Page 2933 her Financial Affidavit.
16. The court orders no alimony be paid or received by either husband or wife.
17. The family photographs which the wife allegedly removed from the marital residence shall be made available to the husband for copying or the wife may copy same for the husband and the parties shall equally share in the copying cost.
18. Furniture in the marital home shall be divided evenly between the parties with the husband receiving a furniture credit for all furnishings previously removed by the wife to furnish her apartment. If the parties cannot agree on the furniture distribution they may consult with the family relations office of the Superior Court for mediation and guidance and if unsuccessful this court will retain jurisdiction of same.
19. Each of the parties shall be liable for their own legal fees and expenses incurred as a result of this dissolution.
20. The parties shall cooperate in the execution of all documents necessary to effectuate the foregoing court orders.
BALLEN, J.